IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 24, 2021 Session

**STATE OF TENNESSEE v. LASEENA TIRREE WHITE**

**Appeal from the Criminal Court for Knox County**
**No. 115164   G. Scott Green, Judge**

_____

**No. E2020-01473-CCA-R3-CD**

_____

The Appellant, Laseena Tirree White, was convicted by a Knox County Criminal Court jury of theft of property valued $10,000 or more but less than $60,000, a Class C felony, and sentenced by the trial court as a Range I, standard offender to three years in the Department of Correction, suspended to supervised probation.  On appeal, she challenges the sufficiency of the evidence, arguing that there was insufficient proof of her identity as the perpetrator and of the value of the stolen items.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and JILL BARTEE AYERS, JJ., joined.

Jackson M. Fenner, Knoxville, Tennessee, for the Appellant, Laseena Tirree White.

Herbert H. Slatery III, Attorney General and Reporter; Cody N. Brandon, Assistant Attorney General; Charme P. Allen, District Attorney General; and Christy Smith and William Bright, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

For a period of approximately eight months in 2015 and 2016, the Appellant, who worked for a housecleaning service, regularly cleaned the Knoxville home of the victims, William and Kimberly Leake.  When the victims were alerted by the Appellant's employer to conduct an inventory of their valuables, they discovered multiple missing items, including jewelry, guns, and knives.  A police investigator discovered that the Appellant

had sold two of the victims' missing rings to a jewelry store and that a man who lived at the Appellant's address had pawned some of the missing knives at a pawnshop. The Appellant was subsequently indicted by the Knox County Grand Jury for one count of theft of property valued $10,000 or more but less than $60,000, which was based on the aggregate value of the stolen items.

At the February 2020 trial, Kimberly Leake testified that she and her husband lived in their home with their twenty-five-year-old son. Mrs. Leake identified the Appellant as an employee of the company they had used to clean their home every two weeks. The Appellant usually arrived on Tuesday at 8:30 a.m. while Mrs. Leake was still at home. Sometimes the Appellant worked quickly, but at other times, the Appellant was still cleaning when Mrs. Leake, a piano teacher, left for her afternoon lessons at a West Knoxville church. The Appellant brought large black trash bags with her to collect the household trash, which was usually inside smaller white plastic bags that Mrs. Leake used inside the trash cans within various rooms of the house. On more than one occasion, the victims told the Appellant not to carry the household trash away with her when she left. According to Mrs. Leake, they stressed to the Appellant that she should deposit the trash in the trash receptacles outside their home or leave it for the victims to dispose of in their business trash receptacles.

Mrs. Leake testified that in July 2016, she received a telephone call from the Appellant's employer that prompted her to take an inventory of her valuables and led to her discovering multiple items were missing. Among the items were her pear-shaped diamond engagement ring, her late mother-in-law's engagement ring with five diamonds, multiple other pieces of jewelry, antique guns, knives, a coin collection, and a pair of sunglasses. Mrs. Leake identified photographs of the two engagement rings, which showed a cut in the band of Mrs. Leake's ring. She explained she had not been wearing her engagement ring because her hands had swollen, and she had been forced to have the ring cut off her finger. Because of the expense, she had not had the ring repaired.

Mrs. Leake testified that her mother-in-law's ring had been in an unlocked jewelry box in the master bedroom, which was the room where most of the missing items had been stored. She said the master bathroom was remodeled in the spring of 2016, but the men worked only when she was at home. Although she was not always in the master bedroom when they worked, she was always in the near vicinity.

Mrs. Leake testified that she did not know anyone by the name "Kristen David White" and had not given anyone permission to take her belongings. She identified a list that she and her husband prepared in July 2016 of their missing items, along with their estimate of each item's value. She agreed that she initially had overestimated the value of her engagement ring as $5,450, based upon what she thought were similar rings for sale on eBay. Since that time, she had learned that her diamond was not as large as her husband

had been led to believe, and her present estimate of the ring's value was $2,000 to $2,500. Conversely, she learned that she and her husband had underestimated the value of her mother-in-law's engagement ring as $695. She said she later found in her closet two pieces of jewelry that she had included on the list of stolen items: an engagement ring that she had valued at $2,295 and a pair of gold and diamond earrings that she had valued at $2,699. She thought that her husband had later found another item on the list, but she could not recall which item.

On cross-examination, Mrs. Leake testified that the Appellant had worked at their home from December 2015 through the middle of July 2016. Although she never saw the Appellant take any of the items from her home, she saw her take trash to her vehicle on approximately half of the days that she cleaned their home. During the other days, Mrs. Leake was not at home when the Appellant completed the day's cleaning. Mrs. Leake testified that the construction crew consisted of the construction company owner and one helper, that the men took approximately two to three weeks to complete the remodel of the Leakes' master bathroom, and that the construction crew took the debris from the home in large buckets. Mrs. Leake said she had piano students in her home two days each week. She stated that she and her husband had filed a claim with their homeowner's insurance company, but the claim was denied due to the fact that the Appellant's employer carried insurance. She said their claim through the Appellant's employer's insurance company was pending the outcome of the criminal trial.

On redirect examination, Mrs. Leake agreed that she and her husband had immediately reported to law enforcement their subsequent discovery of the items that they had originally listed as stolen. On recross-examination, she testified that none of the stolen items had been returned to them.

William Richard Leake, Mrs. Leake's husband and the owner of a towing service and garage, testified that the Appellant always took the trash with her when she left their home, despite his instructing her to place it either in their home's outdoor trash receptacles or in one of his trucks for him to dispose of in his business's dumpster. He identified the list of stolen items that he and his wife had provided to law enforcement and explained that he arrived at the estimated value for each item by searching the internet for similar items for sale and choosing the middle value of the range of prices he found.

According to his testimony, he assigned the following values to the items: $150 for a 20-gauge Savage shotgun; $289 for a 12-gauge Stevens shotgun; $349 for a 20-gauge Stevens shotgun; $499 for a 22-caliber Ithaca saddle rifle; $25 for a rifle case, which he explained was the cost of a new case because he could not find any used ones for sale on the internet; $75 for a leather handsewn rifle case; $636 for his gold and emerald class ring; $134 for a gold and ruby Masonic ring that had belonged to his late father; $649 for his father's gold and diamond wedding band; $1,646 for a "cowboy cut" circular diamond

- 3 -

bought in Las Vegas; $999 for his father's "pinky ring"; $99 for a silver "buffalo nickel" ring; $150 for his paternal grandfather's gold wedding band; $1,746 for his father's rectangular ring with three diamonds; $100 for a silver eagle head ring that had belonged to his father-in-law; $5,450 for his wife's engagement ring, which he later learned he had overvalued because the diamond was not as large as he thought; $699 for his mother's engagement ring with five diamonds, which he later learned he had undervalued; $200 for a man's checkerboard Dale Earnhardt silver ring; $2,920 for a ten karat gold nugget that was "about the size of a dime" made from melting down several of his deceased relatives' gold rings; $244 for a diamond and gold necklace; $784 for a set of eight Little River Railroad knives with authentication certificates; $97 for a Case XX Commemorative National Wood Carver's Association knife; $1,500 for a complete set of silver pennies minted from 1941 through 1945; $300 for a collection of silver certificate bills that he estimated for the purposes of the list at their face value but believed were probably worth more; $189 for six or seven knives, including a "Kissing Crane" knife and a Case X knife, that he had stored together in a plastic Tupperware container; $130 for a pair of Oakley Oil Rigs style sunglasses, which he estimated at the purchase price because his son still had the receipt; $380 in cash that he had stored in a small box on top of his chest of drawers; and approximately fourteen oxycodone pills from a twenty-four count bottle that he had been prescribed following dental surgery, for which he had not assigned any value.

After the prosecutors added the values, Mr. Leake agreed that the total figure on the screen was $14,570. With the court's permission, the prosecutors printed the list with the values totaled, which was then admitted as a trial exhibit. The list reflected that the estimated values of Mrs. Leake's and her mother-in-law's engagement rings were not included in the total.

Items on the original list that the victims later discovered still in their home and also not included in the total, were a platinum wedding band, Mrs. Leake's mother's platinum engagement ring, and some gold and diamond earrings. When shown some knives that law enforcement officers had obtained from a Seymour pawnshop, Mr. Leake identified several as his stolen knives, while disclaiming ownership of others. The knives he recognized as his were marked as Exhibit 4(a) and Exhibit 5(a).

On cross-examination, Mr. Leake acknowledged he had other guns in his home that were not stolen. He testified that he never took any of the oxycodone pills but found only ten remaining in the twenty-four-count bottle. He conceded that he had never weighed the gold nugget and had merely estimated its weight based on the number of rings melted in its formation. He stated that he thought he paid $5,450 for his wife's engagement ring when he bought it in 1993. He testified that the construction crew was never left alone in the home and that the crew carried out the construction debris in five-gallon buckets, which the crew emptied into the garbage cans outside the garage. He stated that he saw the Appellant loading standard-size white trash bags into her vehicle.

- 4 -

Detective Coby Woodrum of the Knox County Sheriff's Office testified that he checked "Leads Online," the reporting program for pawnshops and secondhand stores. He found two rings at "Pardon's" that matched the victims' descriptions and sent the photographs to the victims, who recognized them as their stolen items. He identified a Leads Online printout that reflected the seller as "Laseena T. White" and contained her driver's license information, including her address. Based on his further Leads Online research, Detective Woodrum discovered that a man named "Kristin David White," who lived at the same address as the Appellant, had pawned to Sevier Pawn and Loan some knives that Mr. Leake subsequently identified as his stolen property.

On cross-examination, Detective Woodrum acknowledged that he never investigated anyone other than the Appellant as a possible suspect in the crime. He did not interview the construction workers, the piano students, the victims' son, or Mr. White.

Becky Pardon, co-owner of Pardon's Jewelers, testified her records reflected that the store paid the Appellant $321 for a pear-shaped solitaire ring that she estimated would retail at their store for $1,400 to $1,800. The store also paid the Appellant $600 for a fourteen karat yellow gold ring with five diamonds, which she estimated would retail for $2,200 to $2,600. Ms. Pardon's records, which were admitted as exhibits, reflected that one of the transactions occurred on May 24, 2016, and the other on May 27, 2016. On cross-examination, she testified that the store held the rings for thirty days before scrapping the gold and using the stones for other pieces. She did not personally handle the transactions, and the store had no videotapes of the transactions.

Lora Bridges, owner of Sevier Pawn and Loan, identified pawn receipts from her Seymour store location which reflected that "Kristin David White" pawned two Case knives for $25 on June 22, 2016, and an additional four Case knives for another $25 on July 6, 2016. She testified that they typically offered loans of approximately twenty-five percent of a pawned item's retail value. Upon questioning by the court, she recited the Dandridge address on Mr. White's driver's license, which was the same as the Appellant's address. When shown the knives in Exhibits 4(a) and 5(a) that Mr. Leake had earlier identified as his, she estimated that their total retail value was $150.

On cross-examination, Ms. Bridges testified that she had no videotape of the transaction. Upon further questioning by the court, she testified that she was unaware of any pawnshops in Dandridge. She estimated that it was approximately a thirty-minute drive from Dandridge to Seymour.

The Appellant elected not to testify and rested her case without presenting any proof. Following deliberations, the jury convicted her of the indicted offense. The trial court subsequently sentenced her as a Range I, standard offender to three years in the

Department of Correction, with the sentence suspended to supervised probation. Following the denial of her motion for new trial, the Appellant filed a timely notice of appeal challenging the sufficiency of the convicting evidence.

## II. Analysis

On appeal, a jury conviction removes the presumption of the Appellant's innocence and replaces it with one of guilt, so that the Appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The Appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

The Appellant contends that there was insufficient proof that she was the individual who took the property or that the aggregate value of the items was $10,000 or more but less than $60,000. In support, she cites the other individuals who had access to the home and the lack of video or eyewitness evidence of the crime. She also questions the victims' valuation of their property and suggests that they had a motivation to provide inflated estimates. Among other things, she cites the fact that the victims based the valuations on their amateur internet research, were proved to be mistaken in the valuations of the engagement rings, and offered no proof that the guns they alleged had been stolen ever existed. The State responds that the evidence was more than sufficient to sustain the jury's guilty verdict. We agree with the State.

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103 (a). Theft of property valued at $10,000

or more but less than $60,000 is a Class C felony. Id. § 39-14-105(a)(4). Value of property is either "[t]he fair market value of the property . . . at the time and place of the offense[,]" or, "[i]f the fair market value cannot be ascertained, the cost of replacing the property within a reasonable time after the offense." Id. § 39-11-106(a)(39)(A)(ii). The State may charge multiple criminal acts against one or more victims as a single count of theft if the criminal acts arose out of a common scheme, purpose, intent, or enterprise, with the monetary value of the property aggregated to establish the value of the theft offense. Id. § 39-14-105(b)(1)(2).

The Appellant first argues that there was insufficient evidence that she was the individual who took the victims' items. We disagree. Although there was no videotape or eyewitness testimony of the Appellant's theft of the items or sale of the rings, there was strong circumstantial evidence of her guilt. The State provided proof that the Appellant regularly cleaned the victims' home during the same time period that some of the stolen items were sold, that she was left alone at times, and that she routinely took the household trash away with her in a trash bag, despite repeated instructions from the victims to leave the trash at their home. More significantly, the State provided proof that someone using the Appellant's identification sold two of the stolen items to a jewelry store and that a man with the same last name as the Appellant, and lived at the same address, pawned other stolen items at a pawnshop located approximately thirty minutes from the Appellant's home. This evidence was more than sufficient for the jury to find that the Appellant was the perpetrator of the crime.

The Appellant additionally argues that there was insufficient evidence to establish the value of the stolen items. We again disagree. Generally, "[a] witness may testify to the value of the witness's own property or services." Tenn. R. Evid. 701(b); see also State v. Rickman, 631 S.W.2d 448, 450 (Tenn. Crim. App. 1981) ("[A]n owner may testify as to the value of his personal property even though he may not qualify as an expert on its market value.").

Mr. Leake provided detailed descriptions of each item and explained his method of determining value by researching similar items on the internet and choosing the mid-point of the range of prices. He and Mrs. Leake each acknowledged that they were mistaken in their valuations of the engagement rings and explained why they were wrong with respect to Mrs. Leake's engagement ring. As for their erroneous valuations of those rings, we note that those two pieces of jewelry were not included in the prosecutors' final total of the aggregate value of the theft, either at the time of the victims' original erroneous valuations or in the valuations provided by the jewelry store owner during her trial testimony. Even without the inclusion of the two rings, the total was well over the $10,000 threshold required for a Class C felony theft conviction. It was the jury's prerogative, based on the evidence presented, to determine the fair market value of the stolen items. State v. Hamm, 611 S.W.2d 826, 828-29 (Tenn. 1981); State v. Michael Webster, No. M2012-00713-CCA-

R3-CD, 2013 WL 2457181, at *6 (Tenn. Crim. App. at Nashville, June 5, 2013); State v. Alton Tappan, No. W2006-00168-CCA-R3-CD, 2007 WL 1556657, at *5 (Tenn. Crim. App. at Jackson, May 29, 2007). By its verdict, the jury obviously believed the victims' testimony that the items were missing from their home and found that the value of the items was $10,000 or more but less than $60,000.

We, therefore, conclude that the evidence was sufficient to sustain the Appellant's Class C felony conviction for theft of property valued at $10,000 or more but less than $60,000.

### III. Conclusion

Based on the foregoing, we affirm the judgment of the trial court.


_____
NORMA MCGEE OGLE, JUDGE